All right, Mr. Bissenden, you have reserved two minutes for rebuttal, so that gives you Good morning. With the court's permission, I'd like to start with the issue with the court's failure to charge the jury with respect to the statutory date of enactment. The government concedes this error was clear and obvious. And so the question for this court under Marcus is whether there is a reasonable, a reasonable possibility that the jury might have convicted the defendant based on pre enactment conduct. Justice Sotomayor, in describing this burden, described it as, quote, the low threshold of offering a plausible explanation as to how relevant pre and post enactment conduct differed, thereby demonstrating a reasonable possibility that the jury might have convicted based exclusively on pre enactment conduct. And I would submit that we have gone above and beyond that low threshold in this case, a case where the jury was swamped with eight years worth of testimony regarding pre enactment conduct versus four months of post enactment conduct. We make clear in Marcus, it's not the volume of the evidence before and after, right? That's not how the analysis works. Here you have a defendant who makes a series of statements about explosives training and surveillance training. Some of it happens before the effective date. A lot of it happens before the effective date. But I just want you to go through with me both with respect to surveillance and with respect to explosives. He states that he did things in 2005, and the government points to pretty overwhelming corroboration that he did those things. So if you could just address with respect to explosives training, he told them that he conducted – he went to the assassination site of the Lebanese prime minister, and that was on February 14th of 2005, that he took photographs of the blast site, that that was part of his explosives training. So isn't that, putting aside the residue in April of 2005 on the airport, isn't that pretty strong evidence that this explosive training continued into the statutory period? So what I say, and I definitely want to address Your Honor's question. First of all, I'm not entirely certain that under Marcus this court can't consider the volume of pre-enactment conduct. In Marcus, this court said it wasn't concerned about it when you had conduct going back a matter of months. But setting that aside, I understand that the court was focused on differentiation in Marcus, right? That was sort of the standard that it set. And here, again, Mr. Saab was convicted of receipt of training, right? And when we focus in particular on the training evidence, the government offered three discrete categories of training that Mr. Saab received over almost a decade. The first category was his receipt of firearms training. It goes back to 99. The second category was training regarding surveillance, counter surveillance. That's 2003. And the last category, the category that Your Honor referenced, was the alleged explosives training, which allegedly started in 2004, according to the government, bled over into 2005, and so straddled the enactment period. We have a situation here where two of the three categories of evidence that the government relied on unambiguously were pre-enactments. Now, the surveillance training, he said that he went to Istanbul to do a city guide for purposes of surveillance training in 2005. And his passport shows that he was in Turkey on January 10th, 2005. And there's photographs on his hard drive. I guess, and you're right, the testimony about Turkey allegedly, it's a little bit unclear as to whether it was 2004, 2005, right? But his passport shows when he was in Turkey, right? I believe it shows when he was passing through Turkey when he was returning to the United States. I don't believe it captures the timing of the trip. I could be wrong about that, Your Honor, and I know the government's position is that the Turkey trip bled over into 2005. Even accepting that, I'm separating, there's testimony here that relates to clear training, right? Training in the sense of you're going and you're being taught something. And then there's this testimony about surveillance conduct, which really, at trial, the government didn't present that as training evidence. The government presented that as evidence of material support. But is that your argument for the surveillance, then, that that's not training, that that is basically material support, not training? Well, here's what I want to be cautious of, Your Honor. I think it's very easy for this conversation to slip into a conversation about legal sufficiency, right? Whether there was legally sufficient evidence to support a conviction based on post-enactment evidence. And Marcus makes it so clear that this is not a sufficiency analysis. We get the analysis. I don't think there's any question about that. You seem to be arguing that because low-hanging fruit was pre-2004, the jury may have done that and not done the work about post-2004. But I think the real question is, if the jury correctly instructed, is there a reasonable probability that they would not have found that the post-December 17, 2004 conduct was sufficient to establish a risk of harm? Whether there's a reasonable probability that they could have relied on pre-enactment evidence. And absolutely, I think that's the case here. Because we have such a broad and diverse range of activity. But that argument means that if there's a lot of pre-enactment evidence, then there's a likelihood that they may have considered that. It's got to be exclusively considered it. So what is the likelihood that they exclusively considered the pre-December 2004 conduct? What's the basis for saying that? I want to make a point here, that there's two things I'm asking the court to consider. Number one, whether or not there's a reasonable likelihood the jury relied on evidence of training activity, pre-enactment training activity. And number two, specifically, drilling down, specifically whether the jury might have relied on evidence that that training activity gave rise to a foreseeable risk of death or bodily injury. Right, but you just left out again, exclusively. And that's fine. You need that, right? Exclusively. That's what you have to establish. You're correct. A reasonable probability. A reasonable probability that the jury relied exclusively on pre-enactment conduct. In order to find, as part of the government's burden, in order to find a foreseeable risk of death or bodily injury. And I want to point out here, that in summation, the government stood up and they enumerated the four categories of evidence that the jury should rely on in order to find that reasonable risk of death or bodily injury. Each and every one of those four categories was pre-enactment evidence. It was number one, surveillance within the United States. It was number two, the surveillance of Israeli troops from 96 to 2000. Number three, the placement of an IED in 98. And number four, the alleged 2003 attempted assassination. Each and every one of those enumerated facts that the government pointed to, to meet this burden, was pre-enactment conduct. And now the government, for the government to now stand here and say that this court can be assured that the government, that the jury would have sua sponte, found a foreseeable, not training, causing a foreseeable risk of death or bodily injury post-2004. Sua sponte adopted reasoning that the government didn't even advance. It's not a credible position. There's a reason that prosecutors didn't point to that evidence in trying to meet this burden. So your view is if it wasn't relied upon by the government in the summation, then you've met your burden? Well, what I'm saying is there's a reason the government didn't rely on that evidence in its summation, right? They didn't know they needed to. They didn't know that, right? They didn't know that there was going to be this issue that we're talking about now. That's fair. But in my experience, the government, if there's an additional layer of evidence they can point out to support their argument, they're going to point to that argument if they think it's a strong argument. The point is, Marcus asked us to, I'm sorry. I was going to say, I mean, putting aside what the arguments were when we're talking about the character of the evidence. And now you're saying that we've shifted from the ex post facto conversation to the statute of limitations conversation, unless I missed it when we were talking about the foreseeability. That's all statute of limitations. So I want to be careful, because there's sort of multiple statute of limitations arguments here. Right, one aspect of the statute of limitations. This is effectively a Marcus argument, although it touches on the statute of limitations. Well, to the extent you're talking about the jury drawing inferences about causing foreseeable harm, that's not an element of the underlying charge. That's an element of the, one of the hurdles that the state would have to overcome on the statute of limitations. It becomes the government's burden once the statute of limitations is invoked. Yes, Your Honor. Right, okay. So now I'm clarifying that. I've lost my original thread. Oh, the character of the conduct in the post-2005 world, we've got a lot of stuff pre-2005 that's like pointing a gun at somebody and trying to shoot it. I don't know exactly how training fits into foreseeable risk of causing harm. Would the jury be able to say, well, if he's being trained, he may then use that training in a way that causes harm? In other words, I'm trying to figure out whether there's sufficient evidence. I know we're trying to get away from sufficiency, but I'm wondering whether there actually is sufficient evidence post-2004, December 2004. I think that's an absolutely valid and reasonable question. And, of course, it's an argument that we advanced here, that the mere receipt of military training in and of itself does not create a foreseeable risk of death or serious injury. I suppose it depends on the nature of the training, right? If the training includes putting a gun in someone's hand and telling them to shoot someone because this is part of your training. Yes, as opposed to sort of the passive absorption of information. You'd need some evidence that was more specific as to the nature of the training, not just the fact that it was denominated military training. Before it creates a foreseeable risk of injury. But his own statements are that he engaged in three weeks of training on how to construct bombs in approximately 2004 and 2005, right? You concede that's the testimony. I'm conceding that the government introduced evidence. And then there is testimony that in April of 2005, he stopped at the airport with explosives residue on his bag. And the argument that I'm making, though, is whether the receipt of that training, the mere going through the motions of learning how to construct an explosive, in and of itself creates a foreseeable risk of death or bodily injury. And I would submit that it doesn't. The government introduced or called a witness, Brian Murtaugh, who had probably much of the same information. Why would you be undergoing explosives training if not to cause bodily death and injuries? That's the only purpose of explosives training. It creates a latent ability, Your Honor, to act on that training. And I understand that. But I don't think it gets us to the next step of a foreseeable risk that that injury is going to occur. And I did want to— I just want to— For Hizball. He's doing explosives training for Hizball, and it's not foreseeable that this training will result in serious bodily harm. Because it's still within his control and with his power as to how he employs that training, Your Honor. Well, okay. But the training—I mean, what, is it the thought that he's doing this so he can become a demolition expert and taking down buildings in the United States? No, I mean, obviously, I understand the entity that's employing the training. But I still don't think it gets us to the foreseeable risk. I want to make another point, and sort of to circle back to the argument that I was making about Marcus. The fact that we're having this conversation, right, what is the risk of receiving bomb-making training? It's something that reasonable minds could disagree on, right? And it's why the government is not relying on this evidence when it stands up in summation to argue what is the foreseeable risk of death. It's why it points to the much simpler evidence of the alleged assassination attempt or placing the IED. And under Marcus, the question is, does the pre-enactment conduct differ from the post-enactment conduct? And what we have here is pre-enactment conduct that very clearly and easily fits into that box of creating a reasonable foreseeable harm. And post-enactment conduct, the government is now trying to rely on, that fits much less comfortably into that box. And so under Marcus, that's exactly the dynamic Marcus is talking about in establishing plain error. Judge Sullivan's commission, I just want you to spend one minute on the separate claim that this section 332-86 can't apply retroactively. Yes, Your Honor. On the ex post factus clause or under the Landgraf decision. The government only had this in a footnote, but I guess I think it's a much bigger issue, and I want you to address it. I think that claim would be untimely because it should have been raised in a Rule 12 motion because you don't need any facts. You can look at the indictment and make that argument to dismiss the indictment. There were no additional facts that needed to be found for that argument to be made. It's just based upon the statute itself, correct? It could have been raised future. I mean, it's clearly plain error, Your Honor. No, no, no. It's clearly a legal argument. It doesn't turn on facts. If you don't make a Rule 12 motion, it's not plain error. It's untimely. We used to call it waived, but they took the waiver language out of Rule 12. And now courts just say it's untimely on appeal unless good cause is shown. And there is no good cause. We've said repeatedly that an attorney's negligence or inadvertence, which this appears maybe to be, is not good cause. So I don't—we've never overlooked that to address the merits. So isn't that an issue? Maybe there's an ineffective assistive counsel claim, but— Yeah, I mean, obviously this wouldn't be the appropriate forum for me to be advancing that argument as it hinges on— So why is there a Rule 12 problem? I would submit that—and I haven't thought about this a lot, Your Honor, to be honest, so far as it was only a footnote. I would submit that it is both a factual and legal question because it depends on the facts of the case as well. But what facts? Just the date of enactment of the statute? And when the defendant's conduct occurred? Yeah, but that was clear from the indictment that they were alleging conduct, you know, right? Obviously it was not raised in a Rule 12 motion, Your Honor. And so I can see that didn't happen in this case. Our position has been that it's subject to plain error review. Obviously the court will make that decision. All right. I'm happy to answer any other questions. Well, we'll get you back for rebuttal, but thank you, Mr. Brissenden.  Mr. Adelsberg. May it please the Court, Sam Adelsberg of the United States. I represent the government both on this appeal and in addition to the court below. I'd like to pick up where defense counsel was arguing before where Judge Sullivan mentioned about low-hanging fruit. Here, we argue that the low-hanging fruit is actually the post-enactment evidence. That is the evidence that is most corroborated. That's not what you argued to the jury, though, right? That is not what we argued. It was so low-hanging that it just didn't bear a mention in the summation. I don't believe that that's actually the record. We did talk in our summation at length about surveillance activity, at length about— But with respect to material support, not with respect to the training, right? With respect to training, let me just step back. The question before the court here is whether a properly— whether there's a reasonable probability that a properly instructed jury would acquit based on the record before it. The government's—as Judge Bianco mentioned, if the government were aware of this error, we obviously would have made different—we would have tailored our summations to the evidence that the instructions— Why were you not aware of this error? Your Honor, what I can state from the record is that we just did not catch this. So you're saying that Judge Gardiffian, you know, this was error. And even to some extent, it was obvious error, but it wasn't obvious to you. Agreed. We are conceding error here, yes. Well, you're conceding error by him. I didn't seem you were conceding error by yourself. It just seems to me like that's a kind of bad form, it would seem to me. Just to be completely clear, we are conceding error by ourselves. I didn't mean to imply it by him. We did not spot this. The record is very clear on that. Okay. So, Your Honor, this case boiled down essentially to the defendant's admissions about his conduct for his villa, his training for his villa, and the government's ability to corroborate those admissions. And here, we submit that the most corroborated of those admissions were the ones that postdated the enactment of the statute. And I could walk through those. Hold on. Let me ask a question. Let's talk about the military torture. Yep. We've talked about the surveillance piece. Let's assume that one of the pieces that you're going to struggle is that it has to find that the conduct for which it's convicting someone under the substantive statute is conduct that would trigger the opening of the absence of a statute of limitations. Right?  The jury would have to find the foreseeable risk of conduct. And it would have to find the conduct of military-type training on the use of methods that can cause death or serious bodily injuries, further damage to property or disrupt services, political infrastructure, or trade in the use of explosives, et cetera. So one question I have is on the surveillance. Is it a formal conclusion that a jury would even conclude that that conduct fit within the definition of military training, which is the only statute, the only conviction that issue on appeal here? So what I could say is, looking at the definition of military-type training. I just read it to you. Right. That the ‑‑ here, the defendant was trained on how to conduct surveillance for selecting, targeting, and attacking civilian targets to maximize death and destruction in a terrorist attack. This, in our view, would surely constitute training in means or methods that can ‑‑ So the evidence is not ‑‑ so the evidence was that it was part of a ‑‑ I'm not sure who it is. It seems like the wire is loose. Is it over there? Is it at the lectern? Well, let's soldier through it. So we don't have to decide. I suppose we could decide. But we are trying to decide what it would be like to change the jury's jury. I take it your argument is that, if you're relying on the surveillance, that the jury would, with a fair amount of confidence that the jury would have concluded that that training would be open-ended. Taking pictures of sites, soft targets, et cetera, in Turkey. I think we would argue here. I think the clear example is the explosives training. I think that is a very clear example of the type of training. Okay, so now let's get to it. But I don't want to be fair. I'm not forfeiting the surveillance training. For the very reason that the defendant, in his own words, and this is what the FBI genetic trial testified, is that the defendant explained that the purpose of the surveillance was, quote, to facilitate Hezbollah bombing operations against those targets and, quote, to cause the most destruction. That's the appendix at 252. That coupled with... Well, that's the purpose of the surveillance. It's not clear to me where there's the training part. It seems like he got the surveillance training before and then he went and did surveillance. That's why it seemed to me that clearly he acknowledges that the explosives activity in 2004 to 2005 is explosives training, right? Yes, although the surveillance training, there are trainings that he himself describes surveillance as training. So, for example... In 2000, post-December 2004? Yes, Your Honor. Okay, where in the record? I can point to that in the record, and that's at appendix at 316, and that's where he's talking about this training in, this surveillance training in Istanbul. So, he says after, this is in A316, and this is in quotes, after the explosives training, end quote, and we know the explosives training, the timing of that, based on Judge Bianco's point that the Prime Minister Hariri was killed on February 14, 2005. So, after the explosives training, that's on A316, he is, quote, directed to go to Istanbul Turkey, end quote, and he described this as part of his, quote, surveillance training to create a city guide of Istanbul. So, he himself describes this as surveillance training. I think it's important to note here, Your Honor, you know, at trial, we viewed this training, this surveillance training, we principally argued that this was pre-operational surveillance. This is, it's all about wanting off-the-shelf contingency planning, that they wanted to commit an attack on Istanbul or the U.S. The Defense Council repeatedly argued that this was actually training throughout, that when he was doing his operational surveillance, it was actually all training, and in this case, in the Istanbul case, in April 2005, the one that's corroborated by an explosive residue hit on his way back to the United States in April 2005, in that specific case, he's clearly describing this as training. And so, the jury, as Judge Gargafee talked about in rejecting the Rule 29 arguments, could reasonably have concluded, and their verdict may actually suggest this, that what was happening here was actually training, and that training itself, for the reasons that we discussed before, can- So, that's a sufficiency argument, that they could have reasonably concluded it, right? So, we're now asking a slightly different question, which is, is there a reasonable possibility that they could have not concluded that, right? And so, you know, it's interesting, you just mentioned something that I think raises a timeline issue that is one of the problems, I think, the government, that raises, potentially raises a reasonable doubt. You mentioned that he went to Turkey for the surveillance after the explosives training. What you didn't mention is that passage of testimony was tied, his travel to Turkey after the explosives training to December of 2004 or January of 2005. So, if that were the tidbit we were relying on, then the explosives training would have occurred very most likely before the change in statute. Then we have this other piece of evidence that ties the explosives training to Harare, but it calls into doubt the timeline of January. It just suggests these timelines are a little more unclear. Here's what we can say with, I think, with some confidence. He describes his photography and his analysis of the blast site, the Harare blast site, as part of his explosive training. That occurs in February 2005. He also travels to Turkey, which he says is after his explosives training. But he also says it's in December of 2004 or January 2005. Just to be clear, this is the defendant in 2019. We're counting things that happened 15 years earlier.  He may say that. What we present to that trial was his admissions, but also where we were able to corroborate that and actually get a clearer sense of what those dates really meant. For us, we look at, for example, we look at his passport stamp in 2005 for Turkey. Did he get a passport stamp when he passed from Syria, from Lebanon into Turkey? No, what we see in his passport is, and what his story was actually is that when he returned, it appears he took two trips to Turkey in 2005. I just want to be clear about that on the record. Yeah. One of those, I think, was when he was traveling through Turkey on his way to the U.S., and that's the explosive residue hit in April 2005. He also took a trip to Turkey, it appears, in earlier 2005. That trip to Turkey, he talks about how he traveled back to Syria. His handler met him in Syria, and they crossed the border from Syria to Lebanon. So there's no passport stamp that tells us when, within the window that he was in the Middle East, he went up to Istanbul for the surveillance. The only passport stamp is when he's flying home to the U.S. at the end of the whole affair. There's one passport stamp that I recall. That passport stamp is in early 2005. That passport stamp, but he also separately talks about, I mean, he traveled from Turkey to the U.S. in April 2005, and that's why we believe there were actually two trips to Turkey in that period. He may have just been traveling from Lebanon to the United States via Turkey on his way back, and that's where he got the explosive residue hit. But both of those would have been in 2005 based on the timeline that we understand and based on the meaning one is tied to the explosive residue hit in April. But then a jury's going to have to conclude that whatever that explosive training was triggers the statute, and we're going to have to conclude that there's no reasonable – in order to affirm, we have to conclude there's no reasonable probability that a properly instructed jury would have done anything other than both determine that it was within the statute of limitations, putting aside the legal challenge to whether the statute of limitations could even be revived in the way that it was revived, and the jury would have to conclude – we would have to conclude that no jury could have reasonable doubt as to whether the substantive elements of the training statute were met. Is that right? I think here that the standard is whether there's a reasonable probability that a properly instructed jury would have acquitted, and I think here given that there is, I think, clear corroborated post-2005 conduct. I'm talking about the Hariri explosive training, and I'm talking about the explosive residue hit that corroborates his own admissions about surveillance training in Istanbul. Both of those are, in our view, very clear aspects of his training and ones that the court – again, the court, because of our error, was not tracking the enactment date issue, yet in rejecting the defense rule 29 arguments, it focuses very heavily on those two things, right? His surveillance training in 2005 in Istanbul and his – and it also focuses on his explosive training, which is tied to the Hariri blast, which the court talks about. And so in some ways that's telling to us that the court at least saw that as very clear – very clear examples of his military-type training in this case. His military-type training that we have to conclude a no reasonable jury – there's no reasonable probability that a jury would conclude that it – that wasn't sufficient to trigger the extension of the statute. In other words, there's the elements of the crime, but then there's also the foreseeable harm, and I guess I'm struggling with that a little. And I think – I mean, that's what Judge Gardefee also – I mean, again, he wasn't tracking the enactment piece because of our error, but in – what he did find is that the defendant's military-type training did trigger Section 3286 to extend the statute of limitations. He was quite clear on that, and the two bases for that were explosive training and his surveillance training. Again, he was not tracking the – because I don't think you completely answered Judge Robinson's question. Based on what you just said, I think it doesn't necessarily show that January 10th date may be when he left Turkey, not when he entered Turkey, right? Or am I missing that? Isn't that what you just said? The January 10th – The stamp might show him leaving Turkey as opposed to entering Turkey? I believe it's a visa entry stamp to Turkey on January 10th, and there is – the metadata on his phone also shows pictures in Turkey, as we talked about, from 2005 as well. But that's all training is what you're saying. Usually the way it works is you go to training, you go to boot camp, you get training, and then you finish training, and then you go out and you do stuff. The doing stuff isn't part of the training anymore. You seem to be suggesting that the doing stuff is still part of the training, and I guess what is it in the record that suggests that? I think what I'm suggesting is that the jury could have concluded, and this is what Judge Gardolfi found, that in going out and doing this preoperational surveillance for Hezbollah, the defendant could have been doing two things. One is completing his training. Hezbollah was giving him these taskings to go surveil in New York, to go surveil in Istanbul. At the same time – I'm not sure why that's additional training as opposed to now you're operational. You've got your wings. I think that's training inasmuch as the defendant, for example, in the Istanbul case, is saying I was directed to go do a surveillance, meaning he's bringing back his surveillance pictures, he's bringing back what he's casing as targets, and then he's getting feedback on that. This is an iterative process. That's how it happened when he was in Beirut in 2003. Granted that was before enactment, but this is part of his – in some ways I think of it as when you're in training, when you're training to be a lawyer, you're in law school. There's like an iterative part of that where you're going ahead and continuously learning and training. So in the government's view, he never graduated? Not only in the government's view. The Hezbollah expert testified that Hezbollah views training its operatives, sort of ongoing training, as incredibly important, the equivalent of CLE for terrorists. But that's essentially while he was pre-operational. So as you can call material support and training, they're the same. They're all the same thing. Shooting somebody, blowing something up, that's both training and material support. I think I would limit it to pre-operational surveillance itself because that's what the expert here said. And there's a reason why I think defense counsel argued that to the jury in summation, that he was a trainee the entire time and his surveillance was just training because that was what the expert said, that this is how Hezbollah trains its operatives. He described it as his training too, right? Exactly, and he described it as his training too. He couched himself as a trainee to the FBI. Can I make one additional point if there are no further questions? Okay. In defense counsel's reply brief, defense counsel, in our view, advanced a wrong and misleading argument with respect to the metadata for the defendant's post-2005 surveillance photos, and I want to correct the record on that front. It will take me a second just to explain what a modified date is because I think this is important. The government's forensic examiner at trial testified that every photo has several pieces of metadata. Two of those are a creation date and a modified date. The creation date is the first time a photo is placed on a device, whereas a modified date is going to be, and this is a quote from the appendix at 189, the first time a file was created or the last time it was edited. An example might be helpful here. So if I take a photo today on January 10th on my phone, the creation date and the modified date will be January 10th. If tomorrow I move that photo to a hard drive, the modified date will stay the same. That doesn't change. But the creation date will change to January 11th because that's the date that that image was created on that hard drive, so to speak. In this case, the government's forensic examiner further testified that given his review of materials on Saab's hard drive, that he was confident that surveillance images were mass copied onto a separate device, meaning that the creation date changed to the date of transfer, but the modified dates stayed the same. And you can see that because if you imagine if there's, you know, a thousand photos and they all have a 2016 creation date, but the modified dates all go back to earlier dates, then he was able to conclude that they were mass copied. Here there are several additional factors that give us confidence that the modified dates are accurate, and that is one, the photo of the Hariri site that Judge Bianco mentioned earlier. The modified date there is March 8th, 2005, three weeks after the bombing. This aligns with the defendant's timeline of when he took the photo. He says that he took the photo weeks after the bombing. And the second is the defendant took photos at a very famous rally attended by Hassan Nasrallah on March 8th, 2005. To this day in Lebanon, there's something called the March 8th party because of this rally. That photo in his phone, the modified date is March 8th, 2005. And then finally, the defense examiner and the FBI agent both testified that the defense photographs were categorized by year and location. And so, for example, the Istanbul photographs were in a folder that was titled with the year 05 and with the word Istanbul in the actual folder location. And that's at A319, appendix A319. So we have confidence that these were the modified dates are reliable and they are only corroborated by the defense own statements and world events thereafter. Unless there are any other questions, we'll rest on our briefs. All right. Thank you, Mr. Edelsberg. We'll have it for Mr. Grissenden for two minutes to rebut. Just on that last point, I would encourage the court to go back and look at the expert's testimony because it's very clear that the jury was informed that these dates do not necessarily reflect the date on which the photographs were taken. But can I ask this more basic question?  The testimony at trial is that your client tells the FBI that he engaged in explosive training that took place in 2004 and 2005. And so it seems to me your argument has to be that there's a reasonable probability that the jury would have discredited that statement about 2005. And what is the basis for thinking that is the case? I'm concerned again. The Marcus Court could have said that in order for there to be harmless error, all that we need to find is that there's legally sufficient evidence post-enactment. I'm not talking legally sufficient, but it seems to me that that is a statement of your client. And so it seems that why would the jury not credit that statement that he was boasting? I mean, is there anything to suggest that he was not reliable? Again, Your Honor, well, I would encourage the court, right, if the jury accredited every single piece of testimony that the government introduced, presumably they would have had a clean sweep here as far as convictions go. This is not a case where the jury was enamored of the government's case. They only were able to achieve a conviction in three out of seven counts. But do you think there's a reasonable probability that the jury would have discounted the statement of the defendant that he engaged in explosives training in 2005? I think the jury clearly discounted a fair amount of the testimony the government offered because if it had not, presumably they would have convicted on all of these counts. Again, this is a case where the jury rejected all serious counts. When we're trying to decide whether or not there's a reasonable probability, whether it matters here, right, the jury Well, usually we'll say an admission. Where somebody has made an admission, that's a pretty good basis to say there's not a reasonable probability. This case was entirely admissions. And I think in weighing what the jury might have done had it been properly instructed, I think we can't close our eyes to what the jury actually did in this case. We can't act as if the government presented such overwhelming evidence that the jury was swept away and enamored with this case. It clearly wasn't. It rejected some of the fundamental allegations that the government was making in this case. And I suppose even if we reject your argument on that point, we conclude that his admission to offense conduct after the effective date of the statute assuages our concerns as to whether the jury would come out differently if properly instructed. We also then have to address the question of whether there's a reasonable probability that the jury would conclude that training, whatever that is, in and of itself, without more specific examples of training that itself imperils human life, is sufficient to trigger the extension of the statute, assuming we conclude that it's actually legally available. So there's a reasonable probability that the jury would have adopted that reasoning, Your Honor. Reasoning the government never advanced below. Absolutely. I guess we're trying to figure out if it was a properly instructed jury, then it would have. Are we, in this thought experiment of a properly instructed jury, are we imagining that the evidence is the same, but maybe the arguments have conformed to the proper instruction? Or are we imagining only the proper instructions, but the arguments unchanged relative to what they were? You know, even if we set aside the arguments, I think the arguments are relevant because it gives a sense of what people thought was important when they made the arguments. But maybe let's set aside the arguments and just look at the evidence itself. I mean, I think the court very much can consider the arguments that were actually made. But even if we just focus on the evidence itself, assuming, as Judge Sullivan suggests, assuming the jury found that there was enough evidence to find that there was actual training going on in 2005, it would also have had to make that next step. It would have also had to find that that training created a foreseeable risk of death or injury. Training in making bombs. In constructing, but not deploying bombs. So how is the training different? How is his explosive training different in 2004 than it was in 2005? What was the difference that would have led them to make that finding for 2004 conduct, but not for 2005? I mean, I guess this is my point. The government did point to the explosives training when it talked about the things that created a risk of death, right? The things that it pointed to were completely unrelated to the explosives training. Put that aside. What's the difference between his explosive training in 2004 and 2005 where it would have caused? I think part of the problem here is that we listened to the government try to create a coherent timeline when it was pressed on the question, and it struggled to do so. We don't know exactly what happened in 2004 versus 2005. And to say the jury would have- that in the context of what was called explosive trainings, he placed an IED. And he placed an IED in a place where we could- Back in, that was 98, right? Right, but that was pre-2005. Yes, yes. It was in the universe of things the jury could have relied on in the- And the government, because that was a very clear example of risk-creating behavior, something the government highlighted. What evidence do we have as to what it meant to go through explosives training in 2005? Do we have any specific examples of conduct in the course of that training that's comparable to placing an IED? No, Your Honor, because none of it was- none of it was aimed at creating an immediate risk of death, right? It was- as the government describes it, number one, I think the timeline's confused here. We know- the most clear example that we know of explosives training after 2005 is examining a photograph, the Harare piece of it, right? So that's the one that is anchored in 2005. But I think it was clear when the questions were being asked, we don't really know if the building the practice bomb was before that in 2004 or not. We don't have a clear timeline. But none of that conduct, whether it be examining photographs or building a practice bomb which is then detonated, it's not handed off to Hezbollah to use, none of that is comparable to creating the type of risk of death that's involved in an alleged assassination attempt or placing an IED. It's not in the same ballpark, which is, as I'm saying, exactly why the government didn't point to this evidence when it needed to meet that burden. But it's training in means or methods that can cause death or serious bodily injury, right? That's what military training is. That is what training is. So you're quibbling with whether training in bomb manufacturing detonation is training in the means and methods that can cause death or serious bodily injury? I'm saying training creates a latent ability, a potential ability to carry out those types of activities. Do you have any case that makes this latent ability distinction? Hang on. I'm not aware of any case falling on the other side that says training in and of itself gives rise to that risk of death. It's training in means and methods. Making bombs are means and methods that cause death or serious bodily injury. I would submit the government called a witness at trial, Mr. Murdaugh, who probably had similar knowledge to Mr. Saab as to how to construct a bomb. Nobody would suggest that his mere receipt of that knowledge— The guys at the FBI probably get training on how these things get built, too. Of course. But they're not part of an organization that's going to use them, right? The argument is that the jury could find that he was a member of Hizballah in doing this training purely for the academic interests? I don't think it's enough to find a foreseeable risk of death when the control— it's still in the defendant's control whether or not he acts on that training. And there's no evidence that he took the training in building a bomb and that he ever constructed a bomb or sought to place one. There's nothing that brought that potential into an actual foreseeable risk. So there may be some conduct in the course of what's called training that's also material support, right? I mean, the fact that they call it training doesn't insulate it from the reach of the material support, like placing an IED or pointing a gun and shooting somebody. You wouldn't argue that just because those actions were couched in the context of training, they didn't create a foreseeable risk of death. You're making a narrow argument that in the absence of such things, the fact that you called it training doesn't— That's exactly—I'm not suggesting a per se rule. And respectfully, I think that, Judge Sullivan, if we were to accept your reasoning, that would, in effect, create a per se rule. To say that whenever a person who's a member of a terrorist organization receives terrorist training, which is necessarily military training, that creates a foreseeable risk of death, it means, irregardless of the facts almost, there will always be no statute of limitations in a training case. I know the district court judge was resistant to that sort of per se— The foreseeable risk of death language, you're taking from where? The foreseeable risk of death is from 3286, Your Honor. It's the factor that is necessary to extend the statute of limitations indefinitely. Right, but, I mean, the military training is—I mean, are you— I thought you were equivalent with whether or not this is military-type training in the means and methods that can cause death. Are you— No, no, no, I— Are you proceeding that this is military training in the means and methods that can cause death? I'm not arguing that explosives training in and of itself would not be military training. You know, viewing the evidence in the light most favorable to the government, that's not the argument I'm advancing. The argument that I'm advancing is that the mere receipt of military training in and of itself does not create the foreseeable risk of death necessary under 3286 to indefinitely extend the statute of limitations, at least not under the facts advanced here. As Judge Robinson suggested, I'm sure there could be facts where you would have that foreseeable risk of death. I'm saying these facts, and especially the facts relating to his conduct after 2004, didn't create that foreseeable risk of death, which was the government's burden to demonstrate, to show that this was within the statute of limitations. And I suppose if we went that far, then you'd be asking us to reverse and be done with it. Is there a softer argument that doesn't say this conduct doesn't satisfy that, but there's a reasonable possibility that a jury would conclude that it didn't satisfy that, which gets you a reversal but doesn't necessarily preclude a prosecution? I think the government could argue that whether or not this conduct created a foreseeable risk of death is a question for the jury. What I don't think this court can conclude is that this jury necessarily would have reached that conclusion. But just so I understand your argument, it seems to me what you're really saying, then, is that only a training mission with sort of live explosives involving live targets is going to meet the requirements of the statute of limitations limitation lifting. Is that right? If you do this with, we're going to practice today placing IEDs in populated areas, but we're not going to use a bomb. We're going to use a facsimile. That wouldn't do it. It's only until you've actually got live explosives that could go bang that you're going to be able to meet that criteria. I don't think the first hypothetical that you posed, I would argue that that does not create a foreseeable risk. If you know it's a dummy bomb and you just practice placing a dummy bomb someplace, I would argue that doesn't create a foreseeable risk for purposes of the statute of limitations argument. But this is going to be a fact-intensive inquiry. It's whether the commission of this kind of training creates a foreseeable risk of death or bodily injury. The commission of the offense itself, the commission of the offense, yes. Well, the offense in question is the military training, right? Correct. But didn't your client say the purpose of the training was to facilitate bombing operations, was bombing operations against targets and cause the most destruction? Isn't that what the testimony was? He explained what he understood the purpose of the training to be. So this is not a per se rule. Someone could be at a camp and not understand the means and methods of the organization. They're getting some type of military training. They don't understand all the details of what the organization does or what they're going to use it for. Your client told the agent what the purpose of his training was to cause the most destruction. I want to be clear what we're talking about because right now we're talking about bomb building, right, or practice bomb building. I think that conversation or that alleged admission came in the context of surveilling landmarks, Your Honor, which, again, doesn't fit neatly into the mold of training. So he may have understood that that was to facilitate bombing operations but not the explosive training? The explosive training was not to facilitate bombing operations. Only the surveillance was. I'm saying, Your Honor, that I do not believe the mere receipt of the training, the mere receipt of knowledge in and of itself creates a foreseeable risk without some additional steps to act on that training. All right. Well, a lot to think about. Thank you very much. Thank you. Is there a decision?